***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall. The appealing party has shown good grounds to reconsider the evidence. The Full Commission MODIFIES in part and AFFIRMS in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the Deputy Commissioner hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the alleged contraction of an occupational disease, an employer-employee relationship existed between plaintiff and defendant-employer.
3. Defendant-employer is self-insured with GAB Robins North America serving as the servicing agent.
4. Based on the Industrial Commission Form 22 Wage Statement submitted in this matter, plaintiff's average weekly wage is $417.02, which yields a compensation rate of $278.03.
5. The medical records of Dr. John W. Neil, Dr. Jeffrey A. Moore, and Dr. Ted R. Kuntsling were collectively marked as Stipulated Exhibit 1 and received into evidence.
6. Defendant's Answers to Plaintiff's Request for Production of Documents, which include plaintiff's personnel file and various Material Safety Data Sheets, were collectively marked as Stipulated Exhibit 2 and received into evidence.
7. Two separate Industrial Hygiene Survey Reports were collectively marked as Stipulated Exhibit 3 and received into evidence and consists of the following:
 — Industrial Hygiene Survey Report dated June 18, 1981 consisting of 19 pages.
 — Industrial Hygiene Survey Report dated February 18, 1993 consisting of 51 pages.
8. Records of the North Carolina Employment Security Commission consisting of 94 pages were submitted by plaintiff's counsel following the Deputy Commissioner hearing and were received into evidence without objection.
9. The issues before the Commission are whether plaintiff contracted a compensable occupational disease; if so, to what disability compensation and medical treatment is plaintiff entitled under the Workers' Compensation Act; and whether plaintiff's claim was timely filed.
 ***********
Based upon all the competent evidence of record, the Full Commission finds as fact and concludes as a matter of law the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner hearing, plaintiff was 38 years old and had completed the eleventh grade of high school. Plaintiff has never smoked cigarettes and had no pulmonary problems prior to October 1988.
2. Defendant is a golf grip manufacturer located in Laurinburg, North Carolina. Defendant's plant includes a paint department which is predominantly responsible for painting logos on the golf grips. Included in defendant's painting department are the roll paint operation, paint mixer operation, auto spray operation, and cleaning operation.
3. Plaintiff began working for defendant on October 14, 1985 and worked in the roll paint department until 1989. From 1989 until 1995, plaintiff worked in the auto spray department. From 1995 until December 7, 1997, plaintiff worked in the hand paint department. Plaintiff's job duties required her to apply paint to golf club grips. Chemical solvents used in the roll paint operation and auto spray operation included MDI, isopropyl acetate, hexone, toluene, n-butyl acetate, xylene and other petroleum distillates.
4. Industrial hygiene survey reports conducted in defendant's painting department with regard to the foregoing chemicals were within acceptable limits prescribed by OSHA. However, the air samples did reveal that the employees performing the job duties of roll paint, paint mixer, auto spray, and cleaning were exposed to the foregoing chemicals on a constant basis while performing the duties of their employment.
5. Material Safety Data Sheets (MSDS) for the foregoing chemicals indicate that most of the chemicals can result in nasal and respiratory irritation, shortness of breath, tightness of chest, and other respiratory problems when employees are exposed to excessive inhalation of the chemicals.
6. In October of 1988, plaintiff was performing the duties of her employment in the roll paint department when a urethane gun became blocked, causing a thick fog of urethane to permeate the entire painting department. Present at the time of the exposure were plaintiff's supervisor, Linda McGee, and other coworkers. Plaintiff experienced burning in her throat, tightening of her chest, coughing, and wheezing. Plaintiff did not seek medical treatment, but testified that she did not have breathing difficulties prior to this incident. Plaintiff did not file a claim for this incident with the Industrial Commission.
7. As a result of plaintiff's exposure and complaints, plaintiff was provided a respirator by defendant. Plaintiff wore the respirator at all times following her exposure while employed on the third shift. Plaintiff's mask was the type that contained multiple filters and not the more commonly used paper mask.
8. In May of 1989, plaintiff accepted a position on first shift in the auto spray department. According to plaintiff, she had a conversation with a coworker in which she understood that she was not allowed to wear her respirator on first shift due to defendant's concerns that an inspection by OSHA would result in negative consequences from OSHA.
9. Over the ensuing months and years plaintiff began to suffer from constant shortness of breath, throat irritation, and wheezing. Plaintiff consulted her family physician, Dr. John W. Neil, on numerous occasions with respiratory complaints. At the time of the hearing before the Deputy Commissioner, plaintiff contended that Dr. Neil's office misplaced her medical records which were generated prior to February 21, 1994. Based upon the stipulated medical records of Dr. Neil, plaintiff's first complaint regarding respiratory complications occurred on August 9, 1994. Dr. Neil noted in his records that plaintiff could be allergic to paint used at defendant's plant and specifically noted urethane as being the possible reactor. Plaintiff testified at the Deputy Commissioner hearing that Dr. Neil told her in the early 1990's that her coughing and respiratory problems were related to her employment with defendant.
10. On May 4, 1995 and May 1, 1996, plaintiff filed a workers' compensation claim based upon her contraction of right and left carpal tunnel syndrome (I.C. File Nos. 562520 and 655741). Plaintiff's bilateral tunnel syndrome was treated and evaluated by Dr. Paul Rush, Dr. John W. Neil and Scotland Memorial Hospital. On February 13, 1998, plaintiff's treating physician assessed plaintiff with a 5% to 10% permanent partial impairment to her left hand.
11. Plaintiff's workers' compensation claims for carpal tunnel syndrome were heard before Deputy Commissioner Morgan Chapman in Laurinburg, North Carolina on November 3, 1997. Prior to the filing of an Opinion and Award or any further proceedings before the Commission, the parties agreed to settle I.C. File Nos. 562520 and 655741 pursuant to a Compromise Settlement Agreement, and the Commission takes judicial notice of that agreement.
12. As a result of plaintiff's permanent partial impairment and restrictions based upon her contraction of bilateral carpal tunnel syndrome, defendant modified plaintiff's job to that of hand paint, which consisted of hand painting logos on the golf grips. This position was considered light duty by plaintiff, plaintiff's treating physicians, and defendant.
13. Plaintiff was laid off from her position with defendant on December 9, 1997. At that time plaintiff was on light duty as a result of the bilateral carpal tunnel syndrome. Plaintiff was offered employment within defendant's plant in the clutch department, but she did not accept the position because of the bilateral carpal tunnel syndrome. Plaintiff also testified that the job was never presented to a physician for approval and the record in this matter contains no evidence to the contrary.
14. After the lay-off, plaintiff filed for and received unemployment compensation in the amount of $290.00 per week for 26 weeks for a total of $7,540.00.
15. As a condition of plaintiff's continued receipt of unemployment compensation, she was required to conduct two job searches per week. Plaintiff conducted job searches looking mainly for plant type work. Plaintiff unsuccessfully applied for positions with several potential employers.
16. On April 17, 1998, plaintiff was seen by Dr. Jeffrey Moore, a pulmonologist located in Laurinburg, North Carolina, on referral from Dr. Neil. Plaintiff's complaint on that date was shortness of breath which plaintiff contended had existed for an extended period of time but had gradually worsened. Dr. Moore's tentative diagnosis was asthma, based upon plaintiff's history. Plaintiff continued to treat with Dr. Moore on several occasions through August 16, 2001.
17. Plaintiff sought assistance from the North Carolina Department of Vocational Rehabilitation in an effort to obtain her GED. In May of 1998, plaintiff began attending Richmond Community College from 8:00 a.m. to 1:00 p.m., five days a week, to obtain her GED. Plaintiff's tuition was paid by the Department of Vocational Rehabilitation. Plaintiff eventually ceased her efforts to obtain her GED in June 1999 because she was unable to concentrate and was only able to pass one test during her enrollment at Richmond Community College.
18. In September of 1999, plaintiff obtained employment with Wal-Mart as a stocker. Plaintiff was employed 11:00 p.m. to 7:00 a.m., Sunday through Friday, and earned $6.00 per hour.
19. On November 8, 1999, plaintiff resigned her position with Wal-Mart. She testified at the Deputy Commissioner hearing that she was forced to resign because of exposure to environmental irritants while performing the duties of her employment. The environmental irritants existing at Wal-Mart caused her asthma to flare-up, resulting in wheezing, coughing, and shortness of breath. Although plaintiff was receiving treatment from Dr. Moore during the time of her employment at Wal-Mart, she did not return to Dr. Moore at the time of her resignation and Dr. Moore did not take plaintiff out of work due to an increase in her symptoms. Based upon plaintiff's testimony, the employment at Wal-Mart appears to have been plaintiff's last injurious exposure to the hazards of occupational asthma. However, Wal-Mart was not named as a party defendant and there is no expert medical evidence in the record that this employment augmented plaintiff's occupational disease to any extent.
20. On March 8, 2001, plaintiff was seen by Dr. Ted Kuntsling of Raleigh Pulmonary and Allergy Consultants upon referral by her attorney.
21. It was Dr. Kuntsling's opinion, and the Commission finds, that plaintiff contracted occupational asthma based upon her exposure to various chemicals at defendant's plant, including toluene, methyl isobutyl ketone, and methylene bisothynol isocyanate, that plaintiff's job duties with defendant placed her at an increased risk of developing occupational asthma when compared to members of the general public, and that plaintiff's job duties were a significant causal factor in the development of her occupational asthma.
22. When Dr. Kuntsling last saw plaintiff on August 21, 2001, her asthma symptoms and nasal congestion were well controlled with medications and her physical examination and lung function test were normal. Dr. Kuntsling stated that as of August 21, 2001, plaintiff was capable of gainful employment provided that she refrain from environmental exposures including cleaning materials, cosmetics or hot humid environmental conditions. Dr. Kuntsling assigned no permanent functional impairment to her lungs.
23. Plaintiff's prior work history consists of assembly and inspection of furniture. At the time of the hearing before the Deputy Commissioner, plaintiff was not working and was receiving social security disability benefits based upon her inability to work due to carpal tunnel syndrome, arthritis, and her pulmonary complications. Since leaving the job at Wal-Mart, plaintiff has not looked for work.
24. Plaintiff's Industrial Commission Form 18 was filed on or about November 19, 1999 alleging a claim for workers' compensation benefits based upon her occupational exposure while employed by defendant. The Form 18 states that plaintiff's disability as a result of the occupational asthma began December 9, 1997. However, plaintiff's own testimony at the hearing shows that her disability, if any, after December 9, 1997 was due to bilateral carpal tunnel syndrome and was not causally related to the occupational asthma. Plaintiff was able to perform the duties of a hand painter for defendant until the layoff on December 9, 1997. Her refusal to accept the job in the clutch department offered by defendant was based solely on her bilateral carpal tunnel syndrome. Drs. Moore and Kuntsling stated that plaintiff is not disabled from employment due to the occupational asthma but must continue on a permanent basis to avoid exposure to fumes from chemicals and other substances.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's contraction of occupational asthma was due to causes and conditions characteristic of and peculiar to plaintiff's employment, is not an ordinary disease of life to which the general public not so employed is equally exposed, and is a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
2. In order to timely file a claim for an occupational disease, an employee must file the claim within two years from the date he is first informed by competent medical authority of the nature and work-related cause of the disease and from the date on which he is rendered incapable of earning, at any job, the wages the employee was receiving at the time of the incapacity. N.C. Gen. Stat. § 97-58; Howard v. Square-D Co.,128 N.C. App. 303, 494 S.E.2d 606 (1998). The two-year period does not begin to run until both of these factors exist. Id. In the case at bar, plaintiff was first informed that her asthma was work related by Dr. Neil in the early 1990's. However, the greater weight of the evidence fails to show that plaintiff sustained any disability due to the occupational asthma. Therefore, plaintiff's claim that was filed on November 19, 1999 is deemed timely filed.
3. Because plaintiff's claim for occupational asthma was not accepted as compensable, no presumption of disability arises in favor of plaintiff. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682
(1982); Sims v. Charmes/Arby's Roast Beef, 142 N.C. App. 154,542 S.E.2d 277, disc. rev. denied, 353 N.C. 729, 550 S.E.2d 782 (2001). An employee may prove disability by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury or occupational disease, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485,aff'd per curiam, 354 N.C. 355, 554 S.E.2d 337 (2001); Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demeryv. Perdue Farms, Inc., supra.
4. Although plaintiff sustained a compensable occupational disease, the greater weight of the evidence fails to show that she sustained any disability as a result of the contraction of the occupational disease. When plaintiff was laid off by defendant on December 9, 1997, she was working a light-duty job due to the bilateral carpal tunnel syndrome. In her testimony at the hearing plaintiff admitted that she experienced no breathing problems on the light-duty job in hand painting. Plaintiff refused the job offer in the clutch department based upon her belief that she could not perform the job duties because of the carpal tunnel syndrome. Therefore, plaintiff's period of disability after December 9, 1997, was causally related to the carpal tunnel syndrome and not to the occupational asthma. There is no medical evidence of record that plaintiff was unable to work at Wal-Mart due to the occupational asthma. Plaintiff's doctors have all agreed that she is able to work with the permanent restriction that she avoid exposure to chemical and other fumes. Plaintiff failed to make reasonable efforts to seek employment after her resignation at Wal-Mart.
5. Plaintiff failed to prove by the greater weight of the evidence that she is disabled and therefore she is not entitled to disability compensation under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §§ 97-2(9); -54.
6. Plaintiff is entitled to have defendant provide all medical treatment arising from her compensable occupational disease to the extent it tends to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay all medical expenses incurred by plaintiff as a result of her occupational asthma.
2. Under the law, plaintiff's claim for disability compensation must be, and the same is hereby, DENIED.
3. Defendant shall pay the costs.
This the ___ day of February, 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING AND DISSENTING IN PART
 S/_____________ THOMAS J. BOLCH COMMISSIONER